UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ZAM ATIRAM, on behalf of the Phillips 66 Savings Plan, himself, and a class consisting of similarly situated participants of the Plan, | § § § | |
| | § | Civil Action No. 4:17-cv-03740 |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMAND |
| v. | § | |
| | § | |
| PHILLIPS 66 COMPANY, GREG C. GARLAND, PAULA A. JOHNSON, BRIAN R. WENZEL, JOHN D. ZUKLIC, PHILLIPS 66 SAVINGS PLAN COMMITTEE, INVESTMENT COMMITTEE, BENEFIT COMMITTEE, PLAN FINANCIAL ADMINISTRATOR, PLAN BENEFITS ADMINISTRATOR, GREG G. MAXWELL, KEVIN MITCHELL, JESSE A. STEPHAN, ALEX J. SHABET, and JOHN DOES 1-20, | § § § § § § § § § § § § § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT

Plaintiff Zam Atiram ("Plaintiff"), individually, derivatively on behalf of the Phillips 66
Savings Plan (the "Plan"), and alternatively on behalf of all other similarly situated participants
and beneficiaries (the "Participants") of the Plan, brings this action against the Plan's fiduciaries
named herein ("Defendants") pursuant to §§ 404, 405, 409 and 502 of the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1004, 1005, 1109 and 1132.[1]

---

[1] All allegations pled are based upon personal information as to Plaintiff, and the investigation of
Plaintiff's counsel, including but not limited to a review of publicly filed documents, including the
Phillips 66 Plan's filings with the Securities and Exchange Commission (the "SEC"), news reports, or
upon information and belief.  Plaintiff will seek to amend this Complaint to add new parties and/or claims
as permitted, if discovery so warrants.

**NATURE OF THE ACTION**

1.      Plaintiff Zam Atiram ("Plaintiff"), a former employee of Phillips 66 Company, a wholly owned subsidiary of Phillips 66 (together, the subsidiary and holding company are referred to herein as "Phillips 66" or the "Company"), and a participant of the Plan (a "Participant") seeks to recover his and other Participants' losses, and losses to the Plan, caused by Defendants' breaches of fiduciary duties and failure to manage and administer the Plan as required under ERISA.

2.      Phillips 66 (NYSE: PSX), formerly a subsidiary of ConocoPhillips (NYSE:COP) ("Conoco"),[2] became an independent, publicly traded company on April 30, 2012.  According to Conoco's April 4, 2012 press release, the companies were "separated through the distribution of shares of Phillips 66 to holders of ConocoPhillips common stock."   Before the separation, Phillips 66 was the downstream[3] subsidiary of Conoco.

3.      According to the Conoco April 4, 2012 press release:

> Upon repositioning, Phillips 66 will offer a unique approach to downstream integration, comprising segment-leading refining and marketing, midstream and chemicals businesses, while ConocoPhillips will be the industry's largest and most diverse global, pure-play, upstream company.

4.      Following the distribution of shares, Phillips 66 became an entirely separate company from Conoco. According to its May 1, 2012 press release:

---

[2]  Conoco is an independent oil and gas exploration and production company.

[3]  The oil and gas industry is usually divided into three major sectors: upstream, midstream, and downstream.  The downstream sector is the refining of petroleum crude oil and the processing and purifying of raw natural gas, as well as the marketing and distribution of products derived from crude oil and natural gas.  The downstream sector reaches consumers through products such as gasoline or petrol, kerosene, jet fuel, diesel oil, heating oil, fuel oils, lubricants, waxes, asphalt, natural gas, and liquefied petroleum gas (LPG) as well as hundreds of petrochemicals.

Midstream operations are often included in the downstream category and are considered to be a part of the downstream sector.  The midstream sector involves the transportation (by pipeline, rail, barge, oil tanker or truck), storage, and wholesale marketing of crude or refined petroleum products.

> Phillips 66 (NYSE: PSX) today emerges as an independent downstream energy company with industry-leading businesses in refining and marketing, midstream, and chemicals. Created through a spin-off of these assets from ConocoPhillips (NYSE: COP), Phillips 66 begins regular trading on the New York Stock Exchange this morning under the ticker symbol PSX.

5.     The repositioning of Phillips 66 and Conoco into two energy companies (the "Separation") was purported to help grow the value of both companies for shareholders by unlocking the potential of their assets and employees.  Significantly, both Phillips 66 and Conoco remained *energy* companies with their financial prospects dependent upon the energy markets.

6.     The Plan, sponsored by Phillips 66 Company, a wholly owned subsidiary of Phillips 66, became effective May 1, 2012.[4]  The Plan was created by spinning off assets of $2.906 billion from the ConocoPhillips Savings Plan.  A substantial amount of the net assets transferred were in the form of a ConocoPhillips Stock Fund and a ConocoPhillips Leveraged Stock Fund (together the "Conoco Fund Shares"), and there were also a Phillips 66 Stock Fund and a Phillips 66 Leveraged Stock Fund (together the "Phillips 66 Fund Shares").  According to the Plan's SEC filings, "[t]he ConocoPhillips Stock Fund, ConocoPhillips Leveraged Stock Fund and the DuPont Stock Fund were transferred into the Plan from the Company's predecessor at the Plan's inception on May 1, 2012."  The Plan's SEC filings further represent that "Company Stock means the stock held in the Phillips 66 Stock Fund and the Phillips 66 Leveraged Stock Fund accounts. Company Stock does not refer to shares of ConocoPhillips Stock Fund, ConocoPhillips Leveraged Stock Fund, DuPont Stock Fund, or Chemours Stock Fund held by the Plan."

---

[4]  The Plan's governing document (the "Plan Document") was filed as Exhibit 4.2 to a Form S-8 that Phillips 66 filed with the SEC on May 1, 2012.

7.      The Plan has held an extraordinary concentration of Phillips 66 and Conoco stock since its inception:



8.      Plaintiff alleges that Defendants negligently and imprudently failed to diversify the Plan's investments in violation of ERISA.[5]   The Plan's substantial investment in ConocoPhillips Stock Fund shares and ConocoPhillips Leveraged Stock Fund shares (collectively, "Conoco Fund Shares") overexposed Participants to volatility and the risk of large losses when it was clearly prudent not to do so.  ERISA required Defendants to divest Conoco Fund Shares from the Plan.

9.      Further, Plaintiff alleges that Defendants breached their fiduciary duties to the Plan and Participants by failing to properly monitor investments and remove the imprudent ones.

10.      Inevitably, as the price of oil and gas fell precipitously, the market price of Conoco stock plummeted.  Despite ominous warnings of impending risks, Defendants did not

---

[5]  As alleged below, the holding of Phillips 66 Fund Shares is not, in and of itself, alleged to be imprudent.  Rather, Plaintiff alleges that those large holdings amplified the risks of holding Conoco Fund Shares.

protect the Plan from the imprudently large holdings of Conoco Fund Shares.  Early post-Separation gains on the Plan's investment Conoco Fund Shares were more than wiped out.  The value of Conoco Fund Shares continued to fall, such that the Plan and its Participants have now suffered substantial losses to the value of their Plan accounts attributable to declines in Conoco Fund Shares.



11.     ERISA imposes upon plan fiduciaries strict duties of loyalty and prudence and requires them to act "solely in the interest of participants and beneficiaries."   29 U.S.C. § 1104(a)(1).  The U.S. Department of Labor ("DOL") has stated that plan sponsors must be held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options" and "monitor investment options and . . . to see that they continue to be appropriate choices."  *See A look at 401(k) Plan Fees* (Aug. 2013), at 2, www.dol.gov/ sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited December 7, 2017).

12.     Plaintiff alleges, among other things, that Defendants breached their fiduciary duties of loyalty and prudence to Plaintiff, the Plan, and alternatively the Class, by failing to diversify adequately the Plan's holdings in Conoco Fund Shares when basic principal of diversification would have protected Participants and the Plan from volatility and overexposure

to two companies in a single market sector.  Defendants' conduct has caused Plan Participants to suffer millions of dollars in losses and declines in their individual Plan accounts.

## JURISDICTION AND VENUE

13.     *Subject Matter Jurisdiction*.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.     *Personal Jurisdiction*.  This Court has personal jurisdiction over all Defendants because they are all residents of the United States, and ERISA provides for nationwide service of process, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

15.     *Venue*.  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, fiduciary breaches alleged occurred in this District, and one or more Defendants reside or may be found in this District. Phillips 66 maintains its headquarters in this district, and the Plan's SEC filings show an address of 2331 CityWest Blvd., Houston, Texas, 77042.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the acts, transactions and/or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### A.     Plaintiff

16.     Plaintiff Zam Atiram is a former Phillips 66 employee and Participant in the Plan within the meaning of ERISA.  Plaintiff held Conoco Fund Shares in his individual Plan account during the Relevant Period (defined below).  During the Relevant Period, the value of Plaintiff's account value diminished due, in large part, to Defendants' breaches of fiduciary duty described herein.  Plaintiff Atiram is similar, in all material respects, as the thousands of other Participants who entrusted these Defendant-fiduciaries with their retirement savings.

**B.**     **Defendants and Their Fiduciary Status**

    **1.**     **Company Defendant**

17.    Phillips 66 Company, a wholly owned subsidiary of Phillips 66,[6] is incorporated in Delaware and shares offices with Phillips 66.

18.    Defendant Phillips 66 Company is the Plan's sponsor within the meaning of 29 U.S.C. § 1002(16)(B), the participating employer in the Plan, and provides funding for the Plan.

19.    Phillips 66 Company is, and at all relevant times has been, a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).  Phillips 66 acted through its employees and agents, as identified below, to perform Plan-related fiduciary functions.  Phillips 66, at all relevant times, was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

    **2.**     **Phillips 66 Company's Board of Director Defendants**

20.    Defendant Phillips 66 Company Board of Directors at all relevant times had and continues to have the power to appoint and/or supervise individuals with responsibility for managing Plan assets, including the Savings Plan Committee, Benefits Committee, Investment Committee.

21.    The Phillips 66 Savings Plan states:

> The Board of Directors of Phillips 66 Company, or its delegate the Chief Executive Officer of Phillips 66 Company, shall appoint a Phillips 66 Savings Plan Committee consisting of such number of officers or other employees of the Employer as it shall deem appropriate and shall designate its chairman. The Board shall also appoint such alternate members, as it may consider appropriate. The members and alternates of the Committee shall serve at the pleasure of the Board and without

---

[6] Phillips 66 is an energy manufacturing and logistics company incorporated under Delaware law in 2012 that maintains its headquarters at 2331 CityWest Blvd., Houston, Texas, 77042.  As of December 31, 2016, Phillips 66 had approximately 14,800 employees.

compensation from the Plan, but shall be reimbursed by the Company for all necessary expenditures incurred in the discharge of their duties as members of the Committee. The Plan Financial Administrator shall be the person occupying the position of Treasurer of Phillips 66 or his successor(s). The Plan Benefits Administrator shall be the person occupying the position of Manager, Benefits, Phillips 66 Company or his successor(s).

*See* Plan Document Article XIX.1.

22.     Defendant Greg C. Garland ("Garland") has served as Chairman of the Board of Directors of Phillips 66 Company (the "Board") and Chief Executive Officer ("CEO") of Phillips 66 Company at relevant times.  Garland signed a November 5, 2012 Form S-4 (the "S-4") and a November 10, 2015 Form S-3 (the "S-3") on behalf of Phillips 66 Company as its "Chief Executive Officer (Principal Executive Officer).  Amendment 2 to a Schedule 14D (the "14D") filed by Phillips 66 Partners LP lists Garland as Chairman of the Board and CEO of Phillips 66 Company as of March 2, 2015.

23.     Defendant Paula A. Johnson ("Johnson") has served as a member of the Board at relevant times.  Johnson signed the S-4 and S-3 as a Director of Phillips 66 Company and is listed as a Director in the 14D, which also lists her as Phillips 66's, and Phillips 66 Company's, Executive Vice President, Legal, General Counsel, and Corporate Secretary.

24.     Defendant Brian R. Wenzel ("Wenzel") has served as a member of the Board at relevant times.  Wenzel signed the S-4 as a Director of Phillips 66 Company and is listed as a Director in the 14D, which also lists him as Phillips 66's, and Phillips 66 Company's, Vice President and Treasurer.

25.     Defendant John D. Zuklic ("Zuklic") has served as a member of the Board at relevant times.  Zuklic signed the S-3 as a Director of Phillips 66 Company.

26.     Defendants named in Paragraphs 20-25 are referred to herein as the "Phillips 66 Company Board of Director Defendants" or the "Monitoring Defendants".

### 3. Phillips 66 Savings Plan Committee

27.     Pursuant to Article XIX.2 of the Plan Document, the Phillips 66 Savings Plan Committee (the "Savings Plan Committee") "shall be a fiduciary under the Plan and shall have all powers necessary or desirable to discharge the duties relating to the administration of the Plan as are delegated to it by the Plan and Trust Agreements, including, without limitation" "establish[ing] and enforc[ing] such rules, regulations, procedures and forms as it shall deem necessary or appropriate for" "[t]he investment of assets of the Plan[.]"

28.     The Savings Plan Committee had absolute discretion in carrying out its responsibilities, and ERISA's mandates trumped any purported mandates of the Plan.

### 4. Benefits Committee and Investment Committee Defendants

29.     In 2013, Plan governance was modified, such that Savings Plan Committee was replaced by a Benefits Committee and an Investment Committee.

30.     The Plan's June 21, 2013 Form 11-K Annual Report (the "2013 11-K") states, in relevant part:

> The Plan is administered by the Investment and Benefit Committees (Committees), a Plan Financial Administrator, a Plan Benefits Administrator, and the Chief Financial Officer of the Company, collectively referred to as the Plan Administrators. Members of the Committees are appointed by the Board of Directors of the Company or its delegate. The Plan Financial Administrator and the Plan Benefits Administrator are the persons who occupy, respectively, the Company positions of Assistant Treasurer, and Manager, Benefits. Members of the Committee and the Plan Administrators serve without compensation, but are reimbursed by the Company for necessary expenditures incurred in the discharge of their duties. Administrative expenses of the Plan are paid from assets of the Plan to the extent allowable by law, unless paid by the Company.

### 5.     Chief Financial Officer Defendants

31.     Section VI.2 of the Plan Document vests Phillips 66's Chief Financial Officer with the authority to select Investment Funds for the Plan and investment managers for such funds:

> The Trust Fund shall consist of the Company Stock Fund, the Leveraged Stock Fund, the ConocoPhillips Stock Fund, the ConocoPhillips Leveraged Stock Fund, the DuPont Stock Fund and such other Investment Funds as may be selected by the Chief Financial Officer of Phillips 66, in his sole discretion, from time to time; provided, however, that at all times the Trust Fund shall include at least one each of the following three types of Investment Funds: (1) a money market mutual fund;  (2) a S&P 500 index mutual fund; and  (3) a bond market index mutual fund.

32.     Plan Section XIX.2.D further states that "[t]he Chief Financial Officer of Phillips 66 shall have the authority to select Investment Funds for the Plan and investment managers for such funds, subject to Section 2 of Article VI."  Any limitations purportedly placed on Plan fiduciaries were ineffective, and not binding, to the extent such limitations conflicted with ERISA.

33.     Defendant Greg G. Maxwell served as Phillips 66's Chief Financial Officer from the Separation in April 2012 until December 31, 2014.

34.     Defendant Kevin Mitchell has served as Phillips 66's Chief Financial Officer since January 1, 2015.

### 6.     The Plan Financial Administrator

35.     Pursuant to Section XIX.2.B of the Plan Document, "[t]he Plan Financial Administrator shall be a fiduciary and shall have responsibility to manage and control the assets of the Plan in accordance with the terms of the Plan, trust agreements, group annuity contracts, investment advisory agreements, guaranteed investment contracts, and such other agreements respecting Plan funds as may be executed, and, in accordance with such regulations and

procedures as the Committee may establish, shall have the authority and dut[ies]" set forth therein.

36.     According to the Plan, as of May 1, 2012, the Phillips 66 Treasurer was designated Plan Financial Administrator.  The 2013 11-K shows the Plan was modified such that the Plan Financial Administrator was designated as Phillips 66's Assistant Treasurer

37.     Defendant Wenzel also served as Phillips 66's Treasurer from the Separation in April 2012 until at least 2013.  As Treasurer, Wenzel served as the Plan Financial Administrator at times during the Relevant Period

### 7.     Plan Benefits Administrator Defendants

Pursuant to Section XIX.2.B of the Plan Document, the Plan Benefits Administrator is a named fiduciary with the "responsibility and authority to control the operation and administration of the Plan in accordance with the terms of the Plan, the trust agreements, group annuity contracts and guaranteed investment contracts, to the extent that they do not involve control or management of Plan assets."   The Plan Benefits Administrator was originally designated as the "Manager, Benefits, Phillips 66 Company or his successor(s)."  That position was subsequently changed to be the "Manager, Total Rewards" of the Company.

38.     Defendant Jesse A. Stephan served as the Plan Benefits Administrator from beginning no later than June 1, 2013, and continuing until at least June 24, 2015.

39.     Defendant Alex J. Shabet served as the Plan Benefits Administrator from beginning no later than June 22, 2016, and continuing until at least June 21, 2017.

### 8.     John Doe Defendants

40.     Plaintiff reserves the right to seek leave to join additional persons who served as fiduciaries of the Plan during the Relevant Period once their identities are ascertained.  Thus, without limitation, unknown "John Doe" Defendants 1-20 are persons, including but not limited

to Phillips 66 officers, employees, and/or agents, who were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Relevant Period, including those who served as members of any of the committees identified above, as Plan Financial Administrator, as Plan Benefits Administrator, the identities of whom are unknown to Plaintiff at this time.

## ERISA'S FIDUCIARY DUTIES AND
## DEFENDANTS' STATUS AS PLAN FIDUCIARIES

41.     During the Relevant Period, each Defendant was a named or a *de facto* fiduciary of the Plan with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

42.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

43.     In addition to named fiduciaries, under ERISA, any person who, in fact, performs fiduciary functions is also a fiduciary of the Plan to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."   ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

44.     Each Defendant was a fiduciary of the Plan during the Relevant Period because each Defendant:

(a)     was a named fiduciary; and/or

(b)     exercised authority or control over management or disposition of the Plan's assets; and/or

(c)     exercised discretionary authority or discretionary control over management of the Plan; and/or

(d)     had discretionary authority or discretionary responsibility in the administration of the Plan.

45.     As fiduciaries, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), required each Defendant to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence.

46.     ERISA's duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . ." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

47.     ERISA also required fiduciaries to act with prudence in the selection and monitoring of investments including all associated fees. *See* 29 U.S.C. § 1104(a)(1)(B). During the Relevant Period, Defendants failed to undertake and apply a systematic and unbiased process to review and evaluate the prudence of investments in the Plan.

48.     ERISA further requires fiduciaries to "diversify[] the investments of [a] plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so[.]" 29 U.S.C. § 1104(a)(1)(C).  ERISA makes an exception to this duty for eligible individual account plans ("EIAPs"), like the Plan, for which "the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title)." 29 U.S.C. § 1104(a)(2).  29 U.S.C. § 1107(d)(5), in turn, defines employer securities as qualifying for this exception, and 29 U.S.C. § 1102(5) defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and the proposed class (the "Class") defined as follows:

> All persons, except Defendants and their immediate family members, who were Participants, at any time between May 1, 2012 and the present (the "Relevant Period").

50.     The members of the Class are so numerous that joinder of all members is impractical.  Upon information and belief, the Class includes thousands of persons.  Plan Forms 5500 filed with the Department of Labor show that as of December 31, 2012, the Plan had 12,005 Participants and that as of December 31, 2016, the Plan had 14,800 Participants.

51.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' actions/inactions.

52.     There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

(a)     Whether Defendants are Plan fiduciaries;

(b)     Whether Defendants breached their ERISA fiduciary duties of loyalty and prudence to Plaintiff, the Plan, and the other members of the Class regarding the Plan by virtue of the actions and inactions alleged herein;

(c)     Whether certain Defendants failed to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA; and

(d)     Whether the Plan fiduciaries breached their fiduciary duties to Plaintiff, the Plan, and the other members of the Class by failing to comply with the provisions of ERISA set forth above.

53.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation.

54.     Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

55.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.   Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

56.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.[7]

## THE PLAN

57.     The Plan Document's Preamble states:

> THE PURPOSES OF THIS PLAN ARE TO ENCOURAGE AND SUPPORT EMPLOYEE SAVINGS BY OFFERING A SYSTEMATIC SAVINGS AND INVESTMENT PROGRAM WHICH ALLOWS EMPLOYEES THE FLEXIBILITY TO ATTAIN INTERMEDIATE FINANCIAL GOALS AND/OR LONG RANGE FINANCIAL SECURITY AND TO ENCOURAGE AND DEVELOP EMPLOYEE INTEREST AND INVOLVEMENT IN THE COMPANY BY OWNERSHIP OF PHILLIPS 66 STOCK.

See Phillips 66 Savings Plan, Preamble (capitalization in original).

58.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeiture of accounts of the Participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by

---

[7] Class certification is also alternatively appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct as described in this Complaint applied uniformly to all members of the Class.  Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is unaware of any similar claims brought against Defendants by any Class members on an individual basis.  Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.  Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

the Plan are based solely on the amounts allocated to each individual Participant's account and the performance of those investment options.

59.     During 2012 to 2016, the Plan held between $3.490 and $4.637 billion in assets.

## SPECIFIC ALLEGATIONS

**C.     It Was *Per Se* Imprudent for Defendants to Allow the Plan to Hold Such a High Concentration of Undiversified Non-Employer Securities**

60.     ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B).

61.     As an example of fiduciaries acting prudently faced with a similar situation, where "as a result of the spin-off, there were two funds holding exclusively Nabisco stock: the Nabisco Common Stock Fund, which existed prior to the spin-off, and the Nabisco Group Holdings Common Stock Fund, which was created as a result of the spin-off," "RJR, as the Plan administrator, concluded that, given the spin-off, 'it would be inappropriate to hold stock in what was to become a non-related company.'" *Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553, 556 (4th Cir. 2017). "Accordingly, RJR informed Plan participants that the Nabisco Funds would be frozen on the date of the spin-off and divested within six months." *Id.*; *Woods v. S. Co.*, 396 F. Supp. 2d 1351, 1357 (N.D. Ga. 2005) (sunset provision for spun-off Mirant stock over five years)

62.     ERISA requires fiduciaries to diversify a plan's investments so as to minimize the
risk of large losses, unless under the circumstances it is clearly prudent not to do so.  The Scope
of the Restatement (Third) of Trusts,[8] states, in relevant part:

> *Principles of prudence*. In addition to the fundamental proposition that no
> investments or techniques are imprudent per se, there are a few principles
> of prudence set out in the sections that follow. These principles instruct
> trustees and courts that: (1) ***sound diversification is fundamental to risk
> management and is therefore ordinarily required of trustees***; (2) risk and
> return are so directly related that trustees have a duty to analyze and make
> conscious decisions concerning the levels of risk appropriate to the
> purposes, distribution requirements, and other circumstances of the trusts
> they administer; (3) trustees have a duty to avoid fees, transaction costs
> and other expenses that are not justified by needs and realistic objectives
> of the trust's investment program; (4) the fiduciary duty of impartiality
> requires a balancing of the elements of return between production of
> current income and the protection of purchasing power; and (5) trustees
> may have a duty as well as having the authority to delegate as prudent
> investors would.

> (1) The first two of these principles are fundamental to risk management.
> A duty to diversify was included in § 228 of prior Restatements but is so
> central to modern concepts of prudence that it has been incorporated into
> the prudent investor rule of § 227. This pervasive duty and its vital role in
> minimizing "uncompensated" risk are emphasized in the commentary, not
> only as a matter of caution but also as a basic aspect of due care and skill.

(Emphasis added).

63.     Similarly, Comment G to Section 90 of the Restatement (Third) of Trusts states,
in relevant part:

> Asset allocation decisions are a fundamental aspect of an investment
> strategy, and are a starting point in formulating a plan of diversification
> (as well as an expression of judgments concerning suitable risk-return
> objectives). ***These decisions deal with the categories of investments to be
> included in a trust portfolio*** and the portions of the trust estate to be
> allocated to each. These decisions are subject to adjustment from time to
> time as changes occur in the portfolio, in economic conditions or
> expectations, or in the needs or investment objectives of the trust. Basic

---

[8] "ERISA fiduciary's duty is derived from the common law of trusts.  In determining the contours of an
ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct.
1823, 1828 (2015) (internal citations and quotation marks omitted).

asset classifications might begin with cash equivalents, bonds, asset-backed securities, real estate, and corporate stocks, with both debt and equity categories further divided by their general risk-reward or income/growth characteristics, by the domestic, foreign, tax-exempt, or other characteristics of the issuers, and the like.

\* \* \*

The rationale of the trust law's requirement of diversification is more than conservatism or a duty of caution, which admonishes trustees not to take excessive risks--that is, not to take risks higher than suitable to a trust's purposes, return requirements, and other circumstances. The general duty to diversify further expresses a warning to trustees, predicated on the duty to exercise care and skill, against taking bad risks--ones in which there is unwarranted danger of loss, or volatility that is not compensated by commensurate opportunities for gain. Thus, while risk-taking cannot realistically be forbidden, or subjected to an arbitrary ceiling, it is required to be done prudently. A central feature of such prudence ordinarily is the reduction of uncompensated risk through diversification.

Restat 3d of Trusts, § 90, Comment g.

64.     A benchmark for a single security that any retirement plan should have is encapsulated in ERISA, which states that, subject to certain exceptions, "[a] plan may not acquire any qualifying employer security or qualifying employer real property, if immediately after such acquisition the aggregate fair market value of employer securities and employer real property held by the plan exceeds 10 percent of the fair market value of the assets of the plan." 29 U.S.C. § 1107(a)(2).

65.     One exception to 29 U.S.C. § 1107(a)(2) is that 29 U.S.C. § 1104(a)(2) allows EIAPs to be non-diversified if the holding of employer securities is otherwise prudent, is done loyally, and consistent with the plan's documents.

66.     The Plan's holdings of significant assets in Phillips 66 Stock Fund Shares were qualified "employer securities" within the meaning Section 407(d)(1) and subject to the general exception to diversify.  The exception to diversify, however, did not apply to the Plan's holding

of Conoco Fund Shares.  The Plan's holdings, as summarized from its Forms 11-K during the Revenant Period, are as follows:

| all figures in $ thousands | Total Investments At Fair Value | Phillips 66 Stock Fund & Leveraged Stock Fund | ConocoPhillips Stock Fund & Leveraged Stock Fund |
|---|---|---|---|
| 12/31/2012 | $3,552,901 | $917,821 | $1,114,639 |
| 12/31/2013 | $4,428,635 | $1,309,740 | $1,121,479 |
| 12/31/2014 | $4,418,897 | $1,211,771 | $928,410 |
| 12/31/2015 | $4,342,109 | $1,238,823 | $532,249 |
| 12/31/2016 | $4,637,915 | $1,348,375 | $504,313 |

67.     The Plan's concentrated holdings of Conoco Fund Shares, 31.4% of total Plan investments as of December 31, 2012, was *per se* imprudent and not in the interests of the Plan or its Participants.  Moreover, risks stemming from Plan's concentrated holdings of Conoco Fund Shares were amplified by the fact that the Plan's simultaneous holding a similarly large concentration of Phillips 66 Fund Shares.  Conoco and Phillips 66 are both energy companies and exposed to similar market risks, specifically energy prices.

68.     The price of Phillips 66 and Conoco stock are also correlated.  Stock price correlation is a statistic that measures the degree to which two securities move in relation to each other.  In other words, when the price if Phillips 66 stock declines, the price of Conoco stock is also likely to decline.

69.     Following the May 1, 2012 separation, more than half of the Plan's assets were invested in only two correlated oil and gas companies unnecessarily exposing Participants to extreme volatility and risk of large financial losses.  For example, as of December 31, 2012, the Plan held $1.114 billion in Conoco Fund Shares or 32 percent or of the Plan's $3.490 billion total assets, the single largest investment by asset value in the Plan.  The Plan also held $917.8 million in Phillips 66 Fund Shares.  The combined value of the Conoco Fund and Phillips 66 Fund shares was $2.032 billion, or 58% of the Plan's total assets.



70.     By contrast, at this very same time, the Phillips 66 Retirement Plan, a defined benefits plan, where Phillips 66, as opposed to Phillips 66 employees, bore the risk of investment losses, just $7,138,569 of its total investment assets of $1.759 billion, or 4 tenths of one percent was invested in Conoco stock.  As of 12/31/2016, the Phillips 66 Retirement Plan's investment in Conoco stock declined to about 3 tenths of one percent or $7,165,006 of total investment assets of $2,281,245,406.  In other words, Phillips 66 did not want to bear the risk of holding more than a proportionally small stake in Conoco stock in its defined benefit plan.

71.     Similarly, Conoco stock represents far less of the total portfolio of the three mutual funds that own the most Conoco stock:

| Mutual Fund | Conoco shares | Value | Pct of Fund | Size of Fund |
|---|---|---|---|---|
| Vanguard Total Stock Market Index Fund | 28,473,897 | $1.252 B | 1% | 123.43B |
| Vanguard 500 Index Fund | 19,611,459 | $862.3 M | 3.2% | 26.98B |
| Vanguard/Windsor II | 17,239,758 | $825 M | 6.0% | 13.64B |

72.     The Plan's investment of 32% of the Plan's total assets in a single non-employer company stock was negligent and imprudent for its obvious failure to diversify the risk of loss to the Plan and the Plan's Participants.

73.     Defendants also had a fiduciary duty to monitor the Plan's investments and remove imprudent ones.  *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

74.     Given the overconcentration of Plan assets in Conoco Fund Shares, Defendants should have watched very closely for any reports that could cause the value of Conoco Fund Shares to fall.  The failure to divest the Conoco Fund Shares evidences Defendants failure to heed warning regarding Conoco's declining prospects.  It appears that they did not do so because Defendants failed to take steps to adequately divest the Conoco Fund Shares during the Relevant Period.

75.     Defendants' failure to adequately monitor and divest based on concentration of Conoco Fund and Phillips 66 Fund shares alone breached their duty of prudence to the Plan and the Plan Participants.

**D.     The Specific Risks of the Conoco Fund Shares Amplified Defendants' Imprudently Allowing the Plan to Hold Such a High Concentration of Undiversified Non-Employer Securities, Endangering Participants' Retirement Savings**

76.     ConocoPhillips, like Phillips 66 and other energy peers, has been battered by the prolonged weakness in global oil and gas prices.  That presented an uncontrollable, and highly detrimental, post-Separation hurdle to Conoco, which was forced to decrease capital spending, among other strategic changes to Conoco's long-term plans.  As summarized by *The Wall Street Journal* in a January 6, 2013 article entitled "ConocoPhillips's Tricky Two-Horse Strategy":

> Conoco's near-term [*i.e.* post-Separation] strategy implicitly relies on high oil prices, not merely to provide operating cash flow but also to attract high prices for disposals. The danger is not that the Conoco suddenly can't pay its dividend; indeed, it has prioritized it. Rather, it is that weaker prices or unexpected costs would upset the cash-flow math and force investors to dial back their enhanced expectations—and Conoco's valuation with them.

77.     During a turbulent oil and energy market, ConocoPhillips's prospects have been speculative and on the decline in the past several years.  Deprived of the revenue[9] from Phillips 66 post-Separation, ConocoPhillips Net Income/Net Profit fell from $12,436 million in 2011 to $8,428 million in 2012, $9,156 in 2013, $6,869 in 2014, -4,428 million in 2015, and -3,615 in 2016.  Without its downstream and midstream services, Conoco is simply a riskier company and is positioned significantly worse during oil market downturns.   Nevertheless, Defendants exposed and continue to expose the Plan and Participants' retirement savings to an overconcentration in energy securities.

78.     By early 2014, Warren Buffett's Berkshire Hathaway Inc. and related entities (collectively "Berkshire"), for which Conoco at one point accounted for 15% of its portfolio and was its largest-ever investment in a publicly traded company, was cutting its stake in Conoco and by the fourth quarter of 2014 it had sold off its position.  As of September 30, 2014, Berkshire reported holdings of 471,994 shares of Conoco (its last report of such holdings, which were exited that quarter) down from 28,868,637 shares as of June 30, 2012.  In sum, Berkshire held less than 15% of its portfolio in Conoco, which it exited over two and a half years while the Plan held and maintained a higher percentage of Conoco shares, which percentage fell in part because the price of Conoco shares fell significantly and which did not fall based upon any actions taken by Defendants as Plan fiduciaries.

79.     On April 19, 2015, *Dow Jones International News* reported in an article entitled "Oil Drillers Plot Survival Plan" that:

> It isn't just languishing energy prices that weigh heavily on the sector.

---

[9]  ConocoPhillips's revenue fell from just under $64.2 billion in 2011 to just under $23.7 billion in 2016, as operating income fell from $14.871 billion to -$4.611 billion during the same period.

The entire energy picture is changing, as China's economic growth engine sputters and Saudi Arabia abandons its traditional role as the world's swing producer of oil.

Too much supply and not enough demand has unbalanced the market, sending crude prices plunging from more than $100 a barrel last summer to around $55 a barrel today. It's a sharp reversal of fortune that [Daniel Yergin, vice chairman of energy research for IHS Markit] said begs for some industrywide recalibration.

"This is a turning point for markets and for strategies," he said.

In a dramatic shift from prior years' conferences, which mostly featured international oil company CEOs and foreign energy ministers, this year's line-up is loaded with Americans. Executives from the biggest shale oil producers, including Continental Resources Inc., Pioneer Natural Resources Co. and ConocoPhillips, are scheduled to speak. These companies, which spent the last five years drilling as fast as they could, are now slashing budgets, laying off workers and downsizing their drilling plans.

ConocoPhillips will spend 33% less this year on its capital budget than it did last year, but the company is still doubling down on drilling new shale wells between now and 2017. Chief Executive Ryan Lance, who will help kick off the conference Monday, has said that fracking in the U.S. remains the most profitable investment his company can make.

Conoco is trying to sell off many of its older, conventional oil and gas wells around the country so it can focus more exclusively on new shale drilling. During a recent presentation to investors, an analyst asked Mr. Lance whether he's considered selling the entire company. Mr. Lance's reaction: "No, not even no, but hell no."

A better way for American energy producers to weather the downturn would be selling their crude to foreign buyers, he said. But since the 1970s the U.S. has limited access to overseas markets, banning the sale of oil pumped in the U.S. except for a few limited circumstances.

Mr. Lance, who will speak on a panel about the future of U.S. energy policy, has been making the rounds in Washington, D.C. He has asked Congress to lift the oil export ban so U.S. energy companies can keep pumping.

80.     Things became considerably worse.  On July 31, 2015, *Dow Jones International News* reported in an article entitled "Pain Worsens For Oil Giants" that:

> The oil giants typically weather energy downturns because of their
> countercyclical businesses. When oil prices are high, they make richer
> profits from pumping crude out of the ground. When prices are low, they
> make more money from refining inexpensive crude into fuels like gasoline
> and diesel that they can sell at a greater profit.

But Conoco had spun-off its downstream assets in the Separation, hurting its ability to generate

countercyclical profits.

81.     As a result of the uncertainty surrounding its future, on February 4, 2016, Conoco

cut its first quarter dividend payment by 66% to 25 cents a share as it reported a $3.5 billion loss

for its fourth quarter.  Conoco shares fell nearly 9% to $35.32 in response.  Highlighting what a

drastic move this was, Conoco had, during 2015, told, during its investors its dividend was

sacrosanct when, among other things, on April 8, 2015, at its Analyst and Investor Meeting, its

Chairman and CEO repeated, *inter alia*, "our dividend remains the highest priority of cash in the

company.  We will pay our shareholders first" and "the dividend is our top priority use of our

cash[,]" "we've got a long history as a company of growing the dividend and we're going to

continue to grow the dividend in the future."

## CLAIMS FOR RELIEF UNDER ERISA

82.     ERISA requires that every plan name one or more fiduciaries who have "authority

to control and manage the operation and administration of the plan."  29 U.S.C. § 1102(a)(1).

Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact

performs fiduciary functions for the Plan is also considered a fiduciary of the Plan.  A person or

entity is considered a plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control
> respecting management of such plan or exercises any authority or control
> respecting management or disposition of its assets, (ii) he renders
> investment advice for a fee or other compensation, direct or indirect, with
> respect to any moneys or other property of such plan, or has any authority
> or responsibility to do so, or (iii) he has any discretionary authority or
> discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

83.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

84.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

85.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

86.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

87.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the highest known to the law and entail, among other things:

(a)    the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)    the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of

the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)      the duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

88.      Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

89.      ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

90.      Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## FIRST CLAIM FOR RELIEF
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)

91.      Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

92.     At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

93.     Under ERISA, fiduciaries are responsible for ensuring that a plan's investment options are prudent, and that assets within a plan are prudently invested.  Defendants were responsible for ensuring that all investment options available to the Plan participants were prudent and that such investments were consistent with the purpose of the Plan.  Defendants are liable for losses and excessive fees incurred as a result of the above identified investment options being imprudent.

94.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  A fiduciary may not blindly follow plan directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they or a plan direct, including plan trustees, to do so.

95.     Moreover, ERISA § 404 (a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

96.     Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Relevant Period, Defendants knew or should have known that, as described herein, the ConocoPhillips Fund Shares, as detailed above, were unsuitable and inappropriate

investment options for the Plan.  The ConocoPhillips Fund Shares included in the Plan during the Relevant Period clearly did not serve Plan participants' interests, as they were not qualifying employer securities and their inclusion in the Plan did not comport with Defendants' duty to diversify the Plan.  Yet, during the Relevant Period, despite their knowledge of the imprudence of the above investments, Defendants failed to take any meaningful steps to protect Participants from the excessive risks imposed upon the Plan by the ConocoPhillips Fund Shares.

97.     Defendants additionally breached their duties to prudently and loyally manage the Plan's assets by failing to have in place a method of systematic review both the Plan's individual investment options and of the portfolio as a whole in order to ensure that the ConocoPhillips Fund Shares were suitable and appropriate for the objectives of the Plan.  If Defendants had had in place a reasonable method of systematic review, the ConocoPhillips Fund Shares would have been replaced.  Such a review process would have revealed that the Plan maintained significant assets concentration in one industry that over-exposed the Plan given its purpose of retirement savings.

98.     Defendants further breached their duties of loyalty and prudence by failing to ensure that participants liquidated their investments in the ConocoPhillips Fund Shares and transferred the sale proceeds to the other investment options available in the Plan.

99.     Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in the fiduciary breaches of other Defendants.  Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

100.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other members of the Class, who are the Plan's other

participants and beneficiaries, lost a significant portion of the retirement investment.   Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in the ConocoPhillips Fund Shares and thereby eliminated, or at least reduced, losses to the Plan.

101.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Breaches of Fiduciary Duties in Violation of § 404 by the Monitoring Defendants)**

102.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

103.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

104.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Monitoring Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including without limitation, the members of the various committees and others to whom fiduciary responsibilities were delegated.

105.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.   In this case, that means that the monitoring fiduciaries had the duty to ensure that the monitored fiduciaries:

(a)    possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.   They must be knowledgeable about the operations of the plan, the goals of the plan, and the behavior of the plan's participants;

(b)    are provided with adequate financial resources to do their job;

(c)    have adequate information to do their job of overseeing the plan's investments;

(d)     have ready access to outside, impartial advisors when needed;

(e)     maintain adequate records of the information on which they base their decisions and analysis with respect to the plan's investments; and

(f)     report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hand-on fiduciaries.

106.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when the monitoring fiduciaries are not.  In addition, monitoring fiduciaries must provide the monitored fiduciaries with complete and accurate information in the monitoring fiduciaries' possession that they know, and reasonably should know, the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

107.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: failing to monitor and evaluate the performance of the ConocoPhillips Fund Shares such that the Plan lost millions of dollars to unnecessary excessive fees and poor fund performance; failing to monitor the processes and policies by which the Plan's investments were selected, allowing the Plan's assets to remain in the imprudent investment options detailed above rather than in lower fee, similar mutual funds, better performing investments or other investment alternatives such as collective trusts and separate accounts; and failing to remove fiduciaries whose performance was inadequate in that they continued to maintain imprudent ConocoPhillips Fund Shares investments within the Plan, to the detriment of the Plan and Plan participants' retirement savings.

108.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they

enabled the monitored fiduciaries' breaches, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

109.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other members of the Class, who are the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

110.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants, jointly and severally, on all claims and requests that the Court awards the following relief:

A.    A Declaration that Defendants, and each of them, have breached their fiduciary duties to the participants;

B.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits that Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

D.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the proprietary and non-

proprietary funds maintained by the Plan in proportion to the accounts' losses attributable to excessive fees and underperformance of these investments;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

G.      An Order awarding reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  December 11, 2017.

Respectfully submitted,

_/s/ Thomas E. Bilek_
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

_Attorneys for Plaintiff_

**OF COUNSEL:**

Patrick K. Slyne
Michael J. Klein
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY  10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022
Email: pkslyne@ssbny.com
        mklein@ssbny.com